AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original  ☐ Duplicate Original



LODGED
CLERK, U.S. DISTRICT COURT
**10/31/25**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MBV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
**10/31/2025**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ 1V _____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ASSAF WAKNINE,<br>  aka "Ace,"<br>  aka "Assi,"<br>  aka "Assaf Oiknine,"<br><br>                    Defendant. | Case No.  2:25-mj-06827-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 17, 2024, in the county of Los Angeles in the Central District of California, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Transmitting Threatening Communications in Interstate and Foreign Commerce |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Matthew Hernandez, Special Agent, HSI*
*Complainant's signature*

_____
Matthew Hernandez, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    _____10/31/2025_____

City and state:   _____Los Angeles, California_____

_____
*Patricia Donahue*
*Judge's signature*

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSAs: Transnational Organized Crime Section (x2433)

## Contents

I.    INTRODUCTION..........................................2

II.   PURPOSE OF AFFIDAVIT.................................3

III.  SUMMARY OF PROBABLE CAUSE...........................5

IV.   PROBABLE CAUSE......................................7

      A.   Background on Israeli Organized Crime...........7

      B.   WAKNINE's Criminal History......................8

      C.   WAKNINE's Organized Crime Activity.............10

           1.   Extortion.................................11

           2.   Witness Intimidation......................17

      D.   High-Stakes Private Poker Games in Los Angeles..19

      E.   WAKNINE's Connection to Private Poker and
           Relevant Individuals in Los Angeles............21

      F.   Violence at Private Poker Games................22

           1.   Arsons and Shooting.......................23

           2.   Murder of E.L.............................25

      G.   WAKNINE's Threatening Communications to Victim-1
           ..........................................26

V.    CONCLUSION..........................................34

## **AFFIDAVIT**

I, Matthew Hernandez, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.    I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since 2008.  I am currently assigned to the HSI Ventura Northridge Office, where I specialize in investigating, among other crimes, transnational organized crime and racketeering, money laundering, extortion, illegal gambling, witness intimidation, and various other violations of criminal laws, immigration laws, and customs laws.

2.    I have conducted and participated in many aspects of criminal investigations, including conducting physical surveillance, reviewing surveillance footage, serving subpoenas on individuals and entities, debriefing confidential sources, conducting interviews with witnesses and victims, executing search warrants, reviewing evidence seized during search warrants including digital evidence such as text messages and audio recordings, and executing arrests.  Through my investigations, my training and experience, and the training and experience of other law enforcement personnel with whom I have conferred, I have become familiar with the tactics and methods employed by individuals who extort and attempt to extort money from individuals engaged in businesses, including gambling businesses, through violence and threats of violence.

2

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of a criminal complaint against, and request for issuance of an arrest warrant for, ASSAF WAKNINE, also known as ("aka") "Ace," aka "Assi," aka "Assaf Oiknine" ("WAKNINE," pronounced "wahk-nine"), for a violation of 18 U.S.C. § 875(c) (Transmitting Threatening Communications in Interstate and Foreign Commerce) (the "Subject Offense").  WAKNINE is depicted below:



4.    The facts set forth in this affidavit are based on my personal observations; my training and experience; the training and experience of other law enforcement agents with whom I have conferred regarding the facts of this investigation; witness interviews that I have conducted; reports that I have read of interviews conducted by other law enforcement agents; digital evidence that I have reviewed pursuant to federal search warrants; reports that I have read of digital evidence reviewed by other law enforcement agents; review of audio recordings obtained through the investigation; review of immigration

3

documents, including certified "Alien Files" (also known as an "A-File") containing an individual's immigration history in the United States; review of criminal history documents, including certified conviction records; review of telephone records, including pen register and trap and trace data, obtained from third party providers through court orders and subpoenas; summaries and analyses of telephone records prepared by HSI investigative analysts, whom I believe to be qualified to make such summaries and analyses from having worked with them for several years and having reviewed their work product in other matters; review of publicly-available documents and Internet searches for open source information; my conversations with other agents who have participated in this investigation; and conversations with other federal law enforcement agents who participated in separate investigations and with local law enforcement detectives and officers who participated in separate investigations. Accordingly, absent mention below of specific attribution from any of the above-summarized sources of evidence, I have, solely for clarity, generally omitted attribution for a specific fact.

5.    My description of the offense conduct below is based on my review of the above-summarized evidence, including the information contained in the addendum submitted contemporaneously, and is provided solely for the purpose of establishing probable cause to believe that WAKNINE committed the Subject Offense. Accordingly, I have not described all of the evidence that I have reviewed during the course of this

4

investigation and my omission of reference to other evidence
should be considered in that light.

6.    Unless stated otherwise, all conversations and
statements described in this affidavit are related in substance
and/or in part only; all dates are "on or about" or
approximations; all amounts are rounded or close approximations;
and the words "on or about" and "approximately" are omitted for
clarity.

### III. SUMMARY OF PROBABLE CAUSE

7.    I have probable cause to believe that WAKNINE
transmitted a series of communications to Victim-1, in which
WAKNINE threatened to harm Victim-1 if Victim-1 refused to pay
WAKNINE to provide protection for Victim-1's high-stakes private
poker games in Los Angeles, California.[1]

---

[1] The following legal authority was provided by the
Assistant United States Attorney (AUSA):

18 U.S.C. § 875(c) provides: "Whoever transmits in
interstate or foreign commerce any communication containing any
threat to kidnap any person or any threat to injure the person
of another, shall be fined under this title or imprisoned not
more than five years, or both."

The Supreme Court has held that the *mens rea* for section
875(c) is proved when the defendant makes a communication for
the purpose of issuing a threat, or with knowledge that the
communication will be viewed as a threat.  See Elonis v. United
States, 575 U.S. 723, 740 (2015) (transmitting in interstate or
foreign commerce any threat to kidnap any person or threat to
injure the person of another).

A criminal communication under section 875(c) occurs in
both the district where it was sent and the district where it
was received.  See United States v. Abouammo, 122 F.4th 1072,
1091 (9th Cir. 2024) ("the act of making a communication
continues until the communication is received by the person or
persons whom it is intended to affect or influence") (quoting
United States v. Angotti, 105 F.3d 539, 543 (9th Cir. 1997));
United States v. Pace, 314 F.3d 344, 349-50 (9th Cir. 2002)
*(footnote cont'd on next page)*

8.    WAKNINE's threats to Victim-1 are consistent with WAKNINE's pattern of organized crime.  WAKNINE is an Israeli national who previously resided in the Los Angeles area and was deported from the United States to Israel in 2011.  WAKNINE has a lengthy criminal history, including felony convictions, as well as a number of arrests for threatening and extortionate conduct which did not result in a conviction.  WAKNINE's brother, Hai Waknine ("Hai"), has a lengthy criminal history including a federal racketeering conviction for extortion. WAKNINE and Hai invoke each other's reputations for violence to engage in extortion and witness intimidation, and they use individuals affiliated with the Mexican Mafia and Crip gangs in Southern California to serve as their enforcers and extortionate debt collectors.

9.    WAKNINE's threats to Victim-1 occurred approximately seven and a half months after E.L., an Israeli national, was shot and killed outside of a private poker event in the Hollywood Hills (within Los Angeles County), an event which gained widespread notoriety in the insular community of high-stakes private poker in Los Angeles.  The shooter and driver, both Hispanic street gang members, were charged with that murder.  Based on the totality of the investigation and my training and experience, I believe that WAKNINE leveraged the murder of E.L. to instill fear in and bolster his threats to Victim-1.

---

(crime occurs where the communication "originated, passed through, or was received").

## IV. <u>PROBABLE CAUSE</u>

### A.    Background on Israeli Organized Crime

10.    Based on my training and experience, the training and experience of other law enforcement personnel whom I have consulted, and my participation in this case, I have learned the following:

a.    Israeli Based Organized Crime Syndicates ("IBOCS") have long-standing roots in Israel and operate both overseas and in the United States, most prominently in Los Angeles, South Florida, and New York.  IBOCS groups, which organize primarily around familial connections, deploy the methods of traditional organized crime, including the Italian Mafia, and generate revenue by operating and extorting illegal gambling venues, engaging in loan sharking, conducting money laundering, and committing extortion of businesses both legitimate and illicit.  IBOCS groups are known for targeting individuals within and connected to the Israeli community, as well as successful and wealthy businessmen.  As with traditional organized crime groups, IBOCS members have longstanding reputations for violence, and they promote a climate of fear within the Israeli community.  This serves as the basis for widespread extortion and for intimidating witnesses from cooperating with law enforcement, which, in turn, enables IBOCS members to continue committing crimes and evade accountability.

b.    IBOCS members enlist local street gang members and criminals from different backgrounds and ethnicities to commit violence or threaten violence on their behalf, including

7

acts of murder and attempted murder, arson, robbery, kidnapping, stalking, and assaults.  These gang members include individuals affiliated with the Mexican Mafia and Hispanic street gangs in Southern California, as well as members of Crip gangs.

        c.    IBOCS members threaten victims with violence, such as by disguising threats of violence to victims under the pretense of providing "protection" to victims, including "protection" from gang members who are in fact acting on their behalf or at their direction.  IBOCS members often communicate threats of violence in vague or indirect terms and pretend to act as "mediators" so as to maintain a veneer of friendship and credibility with the victim.

        d.    IBOCS members use violence, threats of violence, and other illicit means to collect "debts" incurred by individuals, including in financial disputes and debts incurred at businesses such as gambling businesses.

    **B.**    **WAKNINE's Criminal History**

11.  I reviewed criminal history documents including certified conviction records, the certified Alien File ("A-File") containing WAKNINE's United States immigration history, and law enforcement databases and learned the following:

        a.    In August 2011, WAKNINE was deported from the United States to Israel.  Between 1991 and 2011, while living in the Los Angeles area, WAKNINE was convicted of felonies including assault with a deadly weapon (Los Angeles Superior Court, 1989); burglary, forgery, and possession of forged notes (Los Angeles Superior Court, 1991); conspiracy and uttering

8

false securities (U.S. District Court, Central District of
California, 1997); and eavesdropping (Los Angeles Superior
Court, 2011).[2]

b.    In addition to the above criminal convictions,
WAKNINE incurred at least 10 arrests not resulting in a
conviction, including at least three arrests for "Threaten Crime
with Intent to Terrorize," attempted extortion, making a false
affidavit, perjury, assault with a deadly weapon with force, and
assault with a firearm on a person, and several arrests for
forgery and theft offenses.

12.    I have reviewed law enforcement reports and publicly
available court filings and learned the following:

a.    Hai Waknine, like WAKNINE, is an Israeli national
with an extensive criminal history, including an arrest for
making criminal threats (Los Angeles, 1993), pled down to
fight/noise/offensive words, (Los Angeles Superior Court);
burglary (New York Supreme Court, 1997); and an arrest for
kidnapping for ransom (Los Angeles, 1997), dismissed in the
"interests of justice."[3]

---

[2] Based on review of publicly available information and
conversations with other law enforcement agents, I am aware that
WAKNINE cloned the pager and wiretapped the telephone line of a
Los Angeles Police Department detective conducting a criminal
investigation, which resulted in WAKNINE's 2011 eavesdropping
conviction.

[3] Hai participated in an interview that was broadcast on an
Israeli television show in January 2023, which investigators
thereafter translated from Hebrew to English.  During the
interview, Hai talked about his criminal history, namely his
arrest by the LAPD for kidnapping.  Hai said, in substance, that
he and some associates (whom he did not identify) were involved
in the kidnapping of a person who owed money, and that they cut
*(footnote cont'd on next page)*

b.   Most notably, Hai and four other individuals were indicted in 2004 in the Central District of California for racketeering conspiracy and related charges stemming from incidents in which Hai and others extorted money from individuals via threats of violence.  United States v. Waknine, et al., No. CR 04-373(A)-RGK (Dkt. 95).  Hai was the lead defendant in the indictment targeting an Israeli-based criminal organization operating in Los Angeles, South Florida, and elsewhere in the United States.  Hai pleaded guilty after four days of trial to racketeering conspiracy and, in a plea agreement that included a lengthy factual basis, Hai admitted that he and others threatened businessmen to collect on loans that Hai and others had made.  Id. (Dkt. 274).  In September 2006, Hai was sentenced to 121 months' imprisonment.  Id. (Dkt. 318).[4]

**C.   WAKNINE's Organized Crime Activity**

13.   Through the investigation and my conversations with other law enforcement personnel, I have learned that WAKNINE uses his and Hai's lengthy criminal histories provided above and their long-standing reputations for violence to promote a

---

the victim's ear.  Hai boasted about how he got away with the crime because the victim did not show up to court, and he implied that he or his confederates had something to do with reason the victim did not appear in court.

[4]  Hai was resentenced in July 2009 following appeal to 121 months' imprisonment.  Id. (Dkt. 463).  In 2011, in post-sentence litigation, Hai signed another plea agreement and was sentenced to 36 months' imprisonment.  The factual basis for that plea agreement was consistent with that of his initial plea agreement in that, among other things, he admitted that he loaned out illegally obtained funds and extorted collection of the debts.

climate of fear, particularly within the Israeli community, individuals with ties to the Israeli community, and the WAKNINE brothers' connections in Los Angeles, New York, and South Florida.  This climate of fear protects and enhances their reputation and serves as the basis for widespread extortion, extortionate debt collection, witness intimidation, and other racketeering activity.

14.  Through interviews and conversations with other law enforcement personnel, WAKNINE is believed to reside in Mexico. Through digital evidence seized pursuant to federal search warrants, audio recordings, and telephone records obtained through court orders and subpoenas, WAKNINE, from Mexico, communicates regularly with Hai in South Florida and with other individuals in the United States, including in the Central District of California.

      1.  <u>Extortion</u>

15.  Based on review of digital evidence seized pursuant to federal search warrants, witness interviews, review of audio recordings, and conversations with other law enforcement personnel, I am aware that WAKNINE engages in widespread extortion and extortionate collection of debts, as further detailed below.  One individual relayed to investigators what this person had been told by an Israeli national: "everybody pays" WAKNINE for "protection" and "debt collection" because WAKNINE "is not to be played with."

      a.  WAKNINE maintains connections to United States-based individuals in the Israeli community and those with ties

11

to the Israeli community, as well as connections in Los Angeles developed from his time living in Los Angeles prior to deportation.  WAKNINE uses these connections to involve and insert himself into a range of financial and business arrangements, dealings, and disputes.  WAKNINE often holds himself out as the "mediator" in the dispute between opposing parties, but he usually has a financial interest in the dispute, sides with one of the parties, and uses threats of violence to resolve the dispute on terms favorable to him and his partners.

b.    WAKNINE communicates threats of violence in both text messages and phone calls.  WAKNINE uses encrypted messaging applications, including WhatsApp and Signal, to conceal his criminal communications from law enforcement.  WhatsApp and Signal each allow users to exchange text messages and conduct video and audio calls.

c.    WAKNINE often communicates threats of violence in vague or indirect terms, such as by implying what could happen if the victim does not do as WAKNINE demands, as opposed to explicitly threatening to kill or harm the victim.  For example, in text messages from May 2024, WAKNINE wrote to an individual, "*Listen good mother fucker.  You better come clean direct with me.  Play with us and our money [and] the SEC and [f]eds will be your last fucken issue.  We explained to you in a very direct manner don't fuck us.  And you did*.  Return this asap and we are whole.  Do[n't] and we will ask for damages.  [Redacted] do not play games here."  (Emphasis added).  WAKNINE also wrote to this

individual, "*My partners now want nothing but you, and they will get it.*"

   d. WAKNINE often alternates between threatening victims and acting as a purported "mediator," where he appears to feign friendship to ingratiate himself with his extortion victim. For example, in text messages from November 2023, WAKNINE wrote to another individual, "*don't play games with me. You owe my partner some money. And I want to talk about it Nicely. Please don't upset me with phones games and let me cha[n]ge my mind how to handle this.*" (Emphasis added). WAKNINE will also often follow a thinly veiled threat with words like, "there's no stress here. We're just talking." I believe from my training and experience that WAKNINE seeks to maintain a veneer of friendship with his victim and to provide cover for his threatening statements.

   e. WAKNINE often invokes his reputation for violence as a basis for extortion. For example, in text messages from September and October 2023, WAKNINE had a series of confrontational messages with yet another individual, in which WAKNINE demanded the return of money and jewelry. The individual wrote to WAKNINE, "[n]o need gossiping or back forth I'll get wit u period *stop wit the threats.*" WAKNINE replied, "[n]o problem what time. *And please make sure you understand who this is. You a bit new to LA. If I called there is no option[,] you will understand.*" The individual replied, "[w]ho are u let me see if u someone *I'm talking to a mobster threw a phone* about a police white boy." (Emphases added).

16.    WAKNINE and Hai have developed connections with individuals affiliated with the Mexican Mafia in Southern California, as well as connections with individuals from historically Black gangs including the Crips, whom they use as enforcers and collectors for their extortion schemes.

a.    From a review of digital evidence seized pursuant to federal search warrants and digital evidence reviewed pursuant to a state search warrant, I am aware that WAKNINE and Hai maintain connections with an individual who is, according to California Department of Corrections and Rehabilitation ("CDCR") records, a reputed associate of the Mexican Mafia, also known as "La Eme," hereinafter referred to as "Eme Associate-1."  (From conversations with subject matter experts, I am aware that the Mexican Mafia or "La Eme", very generally, is a prison gang comprised of approximately 150 Hispanic senior gang leaders who have banded together to control the criminal activities of Hispanic inmates in custody facilities in California and Hispanic gang members outside of custody throughout Southern California; an Eme "member" refers to one of the approximately 150 made members of the Mexican Mafia, whereas an Eme "associate" refers to someone working for a "member.")  Eme Associate-1 has a lengthy criminal history dating to the 1980s, including a 1986 federal drug trafficking charge for which he was sentenced to 20 years' imprisonment, and more recently, a 2013 conviction on assault and weapons charges, for which he was sentenced to state prison.

b.     During the execution of a state search warrant at
Eme Associate-1's residence in Southern California in November
2024, investigators found, on a wall in Eme Associate-1's
second-floor foyer, a framed photographic collage with the
title, "The Mexican Mafia," at the top.  The collage also
contained a person displaying a "Black Hand" and other Aztec
symbols which I understand from conversations with subject
matter experts to be affiliated with the Mexican Mafia.  Within
the framed Mexican Mafia collage was a picture of Eme Associate-
1 with Hai.  (I also know from court records that Hai and Eme
Associate-1 were represented in separate cases by the same
lawyer.)  Also depicted in the collage were several members of
the Mexican Mafia.  Also in Eme Associate-1's residence was a
second collage which had the title of "The Mexican Mafia" and
the Black Hand printed.  (Eme Associate-1 also had a separate
set of mementos to John Gotti and other members of the Italian
Mafia.)

c.     Detectives with the LAPD Major Crimes Division,
Transnational Organized Crime Section, participated in the
execution of the above-referenced search warrant.  One detective
left his business card with Eme Associate-1 and attempted
unsuccessfully to interview him.  From a review of digital
evidence pursuant to a federal search warrant, Eme Associate-1
shortly thereafter texted a picture of the LAPD detective's
business card to Hai.  Eme Associate-1 also sent Hai videos and
pictures from his residence depicting law enforcement's search.

d.   From review of digital evidence pursuant to federal search warrants, I am aware that WAKNINE and Hai use the above-referenced connections in the Mexican Mafia, as well as connections in the Crips gang as discussed below, for extortionate debt collection.  For example, in messages from September and October 2023, an individual who investigators know from criminal history documents, court records, and law enforcement records to be affiliated with the Crips ("Crip-1") – - and who has a lengthy criminal history including numerous convictions for violent conduct and firearms-related offenses -- sent WAKNINE screenshots of text messages between Crip-1 and an individual regarding the collection of money.  WAKNINE sent Crip-1 a screenshot of WAKNINE's separate conversation with Eme Associate-1, in which WAKNINE texted the individual's business name and address to Eme Associate-1, who replied, "Okay who is this guy tell me more about the story."  Based on my training and experience, I understand these messages to be Eme Associate-1 seeking more information about the subject from whom WAKNINE was attempting to collect money.  After WAKNINE sent Crip-1 the screenshot of WAKNINE's conversation with Eme Associate-1, Crip-1 responded, "I put my Life on [the] line for your Brother I would never cross him or you homie."  Based on the context, Crip-1 appeared to be referencing Hai when he wrote "your Brother," and based on my training and experience, Crip-1 was expressing his loyalty to WAKNINE and Hai.  In light of Eme Associate-1's and Crip-1's lengthy criminal histories and associations with violent gangs, and based on my training and

experience, I believe the WAKNINE brothers enlist Eme Associate-1 and Crip-1 to use violence and/or threats of violence to collect money from individuals on the WAKNINE brothers' behalf.

        2.  <u>Witness Intimidation</u>

17.  From review of digital evidence seized pursuant to federal search warrants, witness interviews, and review of audio recordings, I am aware that WAKNINE and Hai leverage their feared reputations to intimidate witnesses and to dissuade witnesses from cooperating with law enforcement.

      a.  As just one example, in a December 2023 text message, Hai sent WAKNINE a screenshot of a text message conversation Hai had with an individual, in which Hai wrote the individual, "[a]nswer, Ur a fucken snitch."  Based on my review of audio recordings, I know that WAKNINE also believed this same individual was cooperating with law enforcement.

      b.  Several witnesses with whom investigators spoke or attempted to speak declined to provide any information about WAKNINE or Hai for fear of retribution.  Some witnesses refused to even utter their names and became visibly upset and afraid when investigators inquired about them, with one stating to investigators, "they will kill me if I talk about them."

      c.  In September 2022, in Tarzana, an individual was assaulted by two Israeli nationals, Israeli National-1 and E.L. (both of whom are discussed in further detail below).  This individual called 911, and LAPD officers responded to the scene.  During the response, and as captured on the officers' bodyworn cameras, Hai Waknine called this individual and told him to "let

17

it go," meaning to not file a police report against Israeli
National-1 or E.L.  As captured on the officers' bodyworn camera
footage, the individual, in a series of excited utterances, told
the officers that Hai Waknine was the "main mobster" and "head
of the gang" from the Israeli community who "tax[ed] people" for
protection.  This witness initially did not want to "let it go,"
and he filed a police report.  When responding officers offered
the individual to file a report on Hai, he declined, stating (as
captured on the officer's bodyworn camera), "they'll fucking
really kill us."  The witness thereafter declined to press
charges against Israeli National-1 or E.L.  (I subsequently
interviewed this individual with his counsel present.  The
witness recanted the entirety of his recorded statements.  I did
not find the witness to be credible during the interview, and
the interview ended.)

    18.  WAKNINE and Hai also seek to stay abreast of ongoing
criminal investigations, including by the federal government, in
order to evade detection from law enforcement.  To do so,
WAKNINE and Hai maintain contacts with a small cadre of lawyers
based in Los Angeles who relay information to them about law
enforcement activity that could affect them.

        a.  For example, following the interview of the
above-noted individual regarding the September 2022 incident in
Tarzana involving Israeli National-1 and E.L., I learned that
the individual's lawyer relayed information that ultimately
flowed to WAKNINE regarding federal investigators' questions and

lines of inquiry, including specific materials that were shown
during the interview.

      b.   In addition, in reference to the same individual,
a Los Angeles-based lawyer contacted the LAPD Major Crimes
Division, Transnational Organized Crime Section, seeking
information about the police investigation of the incident.
This lawyer initially declined to confirm whether he represented
the individual but then sent a letter to LAPD stating that he
was representing him.  However, through a review of digital
evidence, I learned that this lawyer -- who purportedly
represented the victim in this incident -- sent the LAPD a
statement from the individual indicating his desire not to press
charges.  Hai texted this letter to Israeli National-1, the
perpetrator of this incident.  Additionally, shortly after the
incident, Hai and the victim held a meeting at the same lawyer's
office where they discussed the incident.  Hai recorded portions
of the meeting and sent the recording to Israeli National-1.

      **D.**   **High-Stakes Private Poker Games in Los Angeles**

    19.  Through the investigation and the evidence summarized
in paragraph 4 above, I am aware of the following:

      a.   In Los Angeles, and particularly since the
pandemic in 2020-2021, there has developed a cottage industry of
private, high-stakes poker games which function as exclusive,
unregulated casinos.  While there are many other private poker
games throughout the city which involve lower stakes, there is a
circuit of elite private poker games in which the amount of
money at stake in any given game reaches well into the millions

of dollars.  These elite poker games cater to a small and select cadre of high net-worth individuals -- from A-list celebrities to wealthy entrepreneurs to professional and amateur poker players -- who prefer the privacy of such events to poker games hosted at publicly operated casinos.  Individuals and groups operate high-stakes private poker games on different nights of the week, with each game having a designated day of the week -- for example, the "Monday game" or "Tuesday game," and so forth.

b.    The atmosphere at the games differs depending on the host -- some game operators run quiet, intimate games, while others create a party-like atmosphere, hiring DJs, chefs, bartenders, and valets, as well as cocktail waitresses who were hired to accompany players.  Such waitresses were often models, actresses, or social media influencers hired for their physical appearance.  Players provided tips to the employees, including the cocktail waitresses.

c.    Victim-1 owned and operated one such high-stakes private poker business in Los Angeles and elsewhere between at least 2022 and late-2024.  Victim-1's private poker events were held on a regular basis, typically once per week.  The buy-in for Victim-1's private poker business started at $20,000 and frequently went higher.  In any given poker event, the amount of money at stake would reach into the millions of dollars.  A player could win or lose well over a million dollars on one night alone.

d.    Victim-1 hired a full slate of employees to create the desired, party-like atmosphere for their poker

events, which included cocktail waitresses, valets, chefs, DJs, bartenders, and experienced card dealers.

   e.   Victim-1 and the other owners of the private poker business, or the "house," profited from hosting poker events, including by taxing employees -- especially the cocktail waitresses -- 50% of the tips they received from players throughout the night.  The house frequently generated profits exceeding $100,000 on a single poker event, ultimately generating millions in profits for the house over the course of a year.  Victim-1 partnered with Associate-1 to operate private high-stakes poker games.

   f.   Occasionally, poker players at Victim-1's private poker events did not pay the full amount they lost or owed.  In these instances, the house assumed the player's loss or debt.

   g.   Victim-1 hired private security guards to provide security services for the poker events.  This security was hired to provide safety and peace of mind to the elite clientele who attended Victim-1's private poker games.

   **E.   WAKNINE's Connection to Private Poker and Relevant Individuals in Los Angeles**

20.   Based on a review of digital evidence, witness statements, and audio recordings, I know that WAKNINE knew several individuals affiliated with Victim-1's poker business and was undoubtedly aware of the business.  Between around March 2022 and May 2023, Israeli National-1 -- a resident of Los Angeles and South Florida -- was a co-owner in Victim-1's and Associate-1's private high-stakes poker business.  Based on a

review of digital evidence pursuant to federal search warrants and digital evidence pursuant to a state search warrant, Israeli National-1 was, until around May 2023, an associate of WAKNINE and Hai.[5]

21.  E.L. was an Israeli national with a lengthy criminal history in Israel who was living in Los Angeles and South Florida.  E.L. played at several poker games hosted by Victim-1. Based on a review of digital evidence seized pursuant to a state search warrant, E.L. and WAKNINE knew each other.  In addition, based on a review of the same evidence, E.L. and Hai communicated frequently between approximately July 2020 and June 6, 2023.  Until approximately May and early June 2023 -- when there were a series of inflammatory and threatening messages from E.L. to Hai (as well as to WAKNINE, including the day before E.L. was killed) -- the text exchanges were on a variety of topics such as luxury vehicles and high-end watches, and most messages appeared to be of a non-confrontational nature, and they often communicated multiple times in a day.  In addition, prior to around January 2023, E.L. and Israeli National-1 were associates, including when they banded together to commit the September 2022 assault in Tarzana.

F.  **Violence at Private Poker Games**

22.  In late May and early June of 2023, there were a series of violent incidents in Los Angeles that occurred at, or

---

[5] Based on information obtained from the Israeli National Police, Israeli National-1 has approximately eight arrests in Israel, including for assault, assault while armed, assault on an officer, possession of narcotics, and possession of a knife.

were connected to, private poker games and/or their operators.
Specifically, between May 21 and May 26, 2023, there were three
arsons -- one of which involved a shooting into a house -- which
occurred at rental properties where Victim-1, Associate-1, and
Israeli National-1 hosted private poker events or were otherwise
connected to Israeli National-1.  Approximately two weeks after
these arsons, E.L. was shot and killed outside of a separate
private poker event in Los Angeles.

       1.   Arsons and Shooting[6]

23.  Based on review of court records and conversations
with LAPD detectives, I learned the following:

       a.   On May 21, 2023, just after midnight, three
suspects arrived at a house located in Beverly Crest.  Victim-1,
Israeli National-1, and Associate-1 had hosted several private
poker games at this house in May 2023.

       b.   The suspects -- one of whom was armed with a
semi-automatic firearm -- jumped over the entry gate to the
house, poured flammable liquid on the exterior of the house, and
threw a Molotov cocktail, which caused the outside of the house
to erupt in fire.

       c.   Two Hispanic juveniles were charged in Los
Angeles Juvenile Court with the arson and later pleaded guilty
to one count of arson as part of a disposition with the arson

---

[6] Because this affidavit is submitted solely for the purpose
of establishing probable cause to believe that WAKNINE committed
the Subject Offense, I have not described all of the evidence
that I have reviewed during the course of this investigation,
including about the arsons and shooting summarized in this
section.

incident discussed next; a third Hispanic individual was charged in Los Angeles Superior Court.  I am not aware of any information that any of the charged individuals knew or had any connection to Victim-1, Israeli National-1, or Associate-1.

24.  Based on review of court records and conversations with LAPD detectives, I learned the following:

a.  On May 23, 2023, Victim-1, Israeli National-1, and Associate-1 hosted a private poker event at a house in Benedict Canyon.  At around 3:30 a.m. (on the morning of the 24th), suspects drove up to the house and lit on fire a Black Bentley SUV parked in front of the house; the Bentley was completely torched and sustained 360-degree fire damage.  A suspect then fired several shots into the house, which nearly hit individuals inside; several sustained injuries trying to flee the location.

b.  The same two Hispanic juveniles who committed the first arson were also charged for this second incident and pleaded guilty to the disposition noted above.  Two other Hispanic individuals, including J.M.S. who was identified as the driver in E.L.'s murder, were also identified this second incident.  Another Hispanic individual was also charged.  I am not aware of any information that any of these individuals knew or had any connection to Victim-1, Israeli National-1, or Associate-1, or anyone attending the private poker event that night.

25.  Based on review of court records and conversations with LAPD detectives, I learned the following:

a.    On May 26, 2023, around 12:45 a.m., an unknown individual drove to the area of a house in Encino Hills.  The house was associated to Israeli National-1 through travel documents and witness interviews.  An unknown individual threw a Molotov cocktail, which caused a car parked in the driveway to light on fire.  The car fire then spread to the home and damaged the house's exterior.  The driver then fled the location, and the car was later abandoned, which was subsequently recovered by LAPD.

b.    Given that the Encino Hills arson had the same modus operandi and also involved the same car as the Benedict Canyon arson/shooting (a White GMC pickup truck), investigators believe one or more of the same individuals also committed the Encino Hills arson.

2.    Murder of E.L.[7]

26.  Through review of court records, I learned the following:

a.    On the night of June 6, 2023, E.L. was a player at a private poker event hosted by T.T. at a luxury house in the Hollywood Hills.  Around 2:00 a.m., E.L. walked out of the house and, in the driveway, was shot in the face and neck by a masked and hooded man.  E.L. died at the scene.

b.    LAPD Homicide Detectives identified R.C., a Hispanic male, as the shooter in E.L.'s murder, and J.S.M. as the driver.  Both were charged in Los Angeles Superior Court

---

[7] As with the preceding section, I have not included all of the information I have gathered to date about the murder of E.L.

with the murder, and they were held to answer on the charges
following a preliminary hearing earlier in 2025.

27.    Based on the investigation to date, I am aware that
the murder of E.L. received widespread attention and notoriety
in the insular community of high-stakes private poker in Los
Angeles and those with close ties to it.  Based on the totality
of the investigation, I know that WAKNINE was, at minimum, aware
of E.L.'s murder, and as explained further below, I believe that
WAKNINE invoked the murder of E.L. to instill fear in and
bolster his threats to Victim-1.

**G.    WAKNINE's Threatening Communications to Victim-1**

28.    Through a review of text messages seized pursuant to
federal search warrants, I learned that on January 17, 2024 --
approximately seven and a half months after the murder of E.L. -
- WAKNINE, using the phone number +40 759 500 500, which I
attributed to him as detailed below, called and messaged Victim-
1 contemporaneously through the WhatsApp encrypted messaging
application.  WAKNINE's phone calls and text messages to Victim-
1 are transcribed below.

| Sender | Time (PST) | Message |
|---|---|---|
| WAKNINE | 7:28PM | [Victim-1] |
| WAKNINE | 7:28PM | It's A |
| WAKNINE | 7:28PM | Answer the phone |
|  | 7:28PM | [Audio Call/Video Call] |
|  | 7:29PM | [Audio Call/Video Call] |

| VICTIM-1 | 7:29PM | Call you in a minute |
|---|---|---|
| WAKNINE | 7:29PM | You hang up me one more time and than your will fucking understand |
| WAKNINE | 7:29PM | Now answer your fucking phone now |
| WAKNINE | 7:29PM | [Audio Call/Video Call] |
| WAKNINE | 7:30PM | Hey mother fucker |
| WAKNINE | 7:31PM | You want to piss me off |
| WAKNINE | 7:31PM | Ok |
| WAKNINE | 7:31PM | [Audio Call/Video Call] |
| VICTIM-1 | 7:31PM | I Don't Know who you are and I'm in a meeting |
| WAKNINE | 7:31PM | Fuck your meeting |
| WAKNINE | 7:32PM | Ok [Victim-1] I guess you really Want to end up like your other bitch ass poker buddy |
| WAKNINE | 7:32PM | You pucks don't learn |
| WAKNINE | 7:33PM | Listen mother fucker |
|  |  |  |
| WAKNINE | 3/21/2024 7:47PM | [Missed Audio Call/Video Call] |

29.  I have probable cause to believe WAKNINE sent the above text messages.  As noted, the phone number was +40 759 500 500 (+40 is the country code for Romania).  Through a review of digital evidence seized pursuant to a federal search warrant, I

know that this phone number is saved in Hai's phone as "Ace-Euro2023." Also in Hai's phone, there is a text message from January 2019 in which the user of the +40 phone number wrote that he got a new phone and identified himself as "Ace," a name WAKNINE used to identify himself in other messages. In addition, from a review of another digital device pursuant to a federal search warrant, the same +40 phone number is saved as "Ace Euro," and there are numerous phone contacts between WAKNINE, using this phone number, and the individual. Further, the Telegram account associated with this phone number has the username "Ace25LA," which is the same name of the email address associated with WAKNINE's Apple account, obtained pursuant to a federal search warrant. Finally, WAKNINE began the text exchange with Victim-1 by writing, "It's A" (for Assaf).

30. I have probable cause to believe WAKNINE transmitted the above text messages in interstate and foreign commerce. Victim-1 was in Los Angeles at the time Victim-1 received the calls and messages from WAKNINE. As noted previously, based on a review of WAKNINE's A-file and immigration documents, WAKNINE was deported from the United States in 2011. Based on a review of immigration records including border crossing records, there are no records of WAKNINE lawfully entering the United States since he was deported. Furthermore, WAKNINE used a phone number with a foreign country code, and the phone number was saved in at least two different phones as "Ace Euro." And based on witness interviews and conversations with other law enforcement

agents, WAKNINE is believed to have been in Mexico at the time he transmitted the text messages to Victim-1.

31. I have probable cause to believe WAKNINE intended to issue a threat to injure and harm Victim-1 and knew that it would be viewed as a threat. Based on the totality of the investigation, I know that WAKNINE was, at minimum, aware of the murder of E.L., and further, that WAKNINE knew Victim-1 was also aware of it. Based on my training and experience, I believe that WAKNINE leveraged the murder to instill fear in and bolster his threats to Victim-1. Given that E.L. was shot and killed outside of a poker game in Los Angeles mere months prior to WAKNINE's text messages to Victim-1; that E.L. had played poker at Victim-1's poker games (and thus was a "poker buddy" of Victim-1); and that Victim-1's poker houses were the target of at least two arsons and a shooting preceding E.L.'s murder, I have probable cause that WAKNINE intended to issue a threat to Victim-1 and knew it would be viewed as a threat.

- "You hang up me one more time and than you[] will fucking understand."

- "Now answer your fucking phone now."

- "Hey mother fucker. You want to piss me off."

- "Fuck your meeting."

- **"Ok [Victim-1] I guess you really Want to end up like your bitch ass poker buddy."**

- **"You pucks don't learn."**

- "Listen mother fucker."

32.  WAKNINE's threats to Victim-1 are also consistent with
WAKNINE's pattern of organized crime, and in particular
WAKNINE's pattern of extortionate threats as described in
paragraph 15 above.

a.  For example, when WAKNINE wrote to Victim-1, "*I
guess you really want to end up like your bitch ass poker buddy*"
and "*[y]ou pucks don't learn*," that was consistent with
WAKNINE's extortionate threats towards another individual months
later when he wrote, "*Listen good mother fucker.  You better
come clean direct with me.  Play with us and our money [and] the
SEC and [f]eds will be your last fucken issue.  We explained to
you in a very direct manner don't fuck us.  And you did.*"  In
each set of messages, WAKNINE did not explicitly threaten to
injure or harm the victim, but he implied that they would suffer
violent consequences if they did not do as WAKNINE demanded.

b.  Similarly, when WAKNINE wrote to Victim-1, "*You
hang up on me one more time and than you[] will fucking
understand*" and "*[h]ey mother fucker[,] [y]ou want to piss me
off*," that was consistent with WAKNINE's threats to an
individual in late 2023 when he wrote, "*please make sure you
understand who this is.  You a bit new to LA.  If I called there
is no option[,] you will understand*."  In each set of messages,
WAKNINE was invoking his well-known reputation for violence to
instill fear in his victim.

33.  Further, I have probable cause to believe that WAKNINE
threatened Victim-1 if Victim-1 refused to pay WAKNINE to
provide protection for Victim-1's high-stakes private poker

games in Los Angeles —— that is, WAKNINE threatened Victim-1 in order to extort Victim-1 as described below.

a.   Through witness interviews, I learned that WAKNINE wanted to be paid $5,000 for each weekly poker game hosted by Victim-1 and Associate-1 (which would have amounted to a yearly value of around $250,000).  Such payments were to be in exchange for WAKNINE providing protection and security for the poker games, meaning to keep the game "safe," and for WAKNINE's assistance with collecting debts that poker players incurred at the games.  (Neither Victim-1 nor Associate-1, or anyone else on their behalf, ever paid WAKNINE for providing such services, or otherwise.)

b.   Through digital evidence seized pursuant to federal search warrants, I learned that Victim-1 shortly thereafter informed his security guard about the extortionate threats from WAKNINE.  Specifically, on January 19, 2024 (two days after WAKNINE's threatening text messages to Victim-1 reflected above), Victim-1 spoke with a security guard and thereafter texted the guard, "Assi Waknine."  Later that night, the security guard texted Victim-1 a link to a 1997 Los Angeles Times article regarding WAKNINE's arrest on stalking charges for cloning a detective's pager and tapping his telephone line, as covered in WAKNINE's criminal history above.  Based on the context in which these messages were sent, including the timing of the messages from WAKNINE two days prior, I believe Victim-1 and the security guard discussed the threatening communications from WAKNINE.  On January 23, 2024, the security guard texted

31

Victim-1, "You canceled the [poker] game tonight.  You ok?"
Victim-1 responded, "I am ok.  I just don't want to deal with
that shit," referring to WAKNINE's threats.  (I am aware from
other evidence that Victim-1 did not hold a scheduled poker
event on January 23, 2024, as the messages indicate.)  On
January 28, 2024, the security guard texted another security
guard employed by Victim-1, that "[Victim-1] is getting extorted
by some Israeli gangster named Ace/asis."  The latter responded,
among other things, "Hope nothing happens to [Victim-1]."  On
February 8, 2024, the security guard texted Victim-1, "Any
issues with that guy on your [poker] event?  With Ace?"  Victim-
1 responded, "No. It's resolved."  The security guard replied,
"Glad to hear that," to which Victim-1 responded, "Oh yes."

34.  WAKNINE's efforts to extort a payment for providing
"protection" to, and collecting "debts" from, Victim-1's poker
business are also consistent with WAKNINE's pattern of organized
crime as set forth in paragraphs 15 and 16 above.

a.  Based on my training and experience, I know that
Israeli organized crime members threaten victims with violence,
including by disguising threats of violence under the pretense
of providing "protection" to victims, including "protection"
from gang members who are in fact acting on their behalf or at
their direction.  And as set forth above, based on the totality
of the investigation including review of digital evidence and
search warrant evidence, WAKNINE and Hai have developed
connections with individuals affiliated with the Mexican Mafia,
including Eme Associate-1, and with Crip gangs, including Crip-

1, whom I believe they enlist to use violence and/or threats of violence to collect money from individuals on their behalf. Therefore, I believe that WAKNINE's efforts to obtain payment in exchange for providing "protection" to Victim-1's private poker business was a classic extortion racket.

       b.    Further, based on my training and experience, I know that members of Israeli organized crime use violence, threats of violence, and other illicit means to collect "debts" incurred by individuals, including debts incurred at businesses such as gambling businesses.  As set forth above, WAKNINE uses implicit threats of violence to collect purported debts ("*You owe my partner some money.  And I want to talk about it Nicely. Please don't upset me with phones games and let me cha[n]ge my mind how to handle this*"), and WAKNINE uses Eme Associate-1 and Crip-1 to serve as his enforcers and extortionate debt collectors.  Therefore, when WAKNINE offered to help collect "debts" incurred at Victim-1's poker business, I believe that WAKNINE would use violence and threats of violence to collect such debts.

    35.  In sum, I have probable cause to believe that WAKNINE, for the purpose of issuing threats and with knowledge they would be viewed as threats, transmitted in interstate and foreign commerce communications containing a true threat to injure and harm the person of Victim-1.

//

//

//

## V.  <u>CONCLUSION</u>

36.  For all the reasons described above, I have probable cause to believe that WAKNINE committed the Subject Offense.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1
by telephone on this 31st day of
October, 2025.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

34